UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

_____

№ 08-CV-1423 (JFB)
_____

RICHARD GARCIA,

Petitioner,

VERSUS

DALE ARTUS,

Respondent.

_____

**MEMORANDUM AND ORDER**
May 5, 2010
_____

JOSEPH F. BIANCO, District Judge:

Richard Garcia (hereinafter "Garcia" or "petitioner") petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, to vacate his conviction in the County Court of the State of New York, County of Suffolk, for one count of kidnapping in the first degree, two counts of criminal possession of a weapon in the third degree, and one count of criminal impersonation in the first degree. Petitioner was sentenced to concurrent terms of imprisonment of sixteen years to life on the kidnapping conviction, two to six years on each of the weapon possession convictions, and one to three years on the criminal impersonation conviction.

Petitioner challenges his conviction on the following grounds: (1) the trial court erred in denying petitioner's motion to suppress evidence recovered from a warrantless search of a vehicle; (2) the trial court erred in denying petitioner's motion to sever his trial from that of his co-defendants; (3) the evidence was insufficient to support petitioner's conviction; and (4) the sentence was harsh and excessive.

For the reasons set forth below, petitioner's request for a writ of habeas corpus is denied in its entirety.

I. BACKGROUND

A. The Evidence at Trial

The Court has adduced the facts below from the instant petition and the state court record in this case.

At about midnight on July 9-10, 2002, Michael DiMartino closed his restaurant and called his wife to explain that he was running

late. (Tr. 545-51.) In fact, he went to a hotel to visit a woman, Margaret Castro, with whom he was having an affair. (*Id.* at 552-55.) After about 45 minutes at the hotel (*id.*), DiMartino dropped Castro off at her home and proceeded to drive to his home. (*Id.* at 559.) On North Bicycle Path, a Dodge Intrepid and van blocked DiMartino's way. (*Id.* at 561-62.) Two men got out of the Dodge Intrepid dressed as members of the New York City Police Department (hereinafter "NYPD"). The men claimed to be police and wore dark shirts and badges around their necks, with radios and guns in their hands. (*Id.* at 563-66.) One of these men was later identified by DiMartino as Joel Rojas (hereinafter "Rojas"), who had previously worked at DiMartino's restaurant. (*Id.* at 765-66.) DiMartino heard the sliding door of the van open and a hood was put over his head. He was thrown into the back of the van, beaten, and tied up. (*Id.* at 567-70.)

DiMartino was forced at gunpoint to speak to his wife by telephone several times. He was told to ask for money and jewelry to be placed in DiMartino's home mailbox. (*Id.* at 571-74.) At about 2:50 a.m. on July 10, 2010, DiMartino's wife (hereinafter "Francesca") spoke with DiMartino on the phone, who stated that he was being held at gunpoint and requested that she bring all the money "out in the front." (*Id.* at 132, 136-38.) At about the same time, Francesca's father, Domenico Malvizzo (hereinafter "Malvizzo"), who was also at the DiMartinos' home (*id.* at 127-28), saw a big car, dark in color, turning in front of the house. (*Id.* at 139-40, 249, 258-59.) Malvizzo went outside and saw a man get out of the car and approach him. Malvizzo described the man as skinny, with a moustache, a baseball cap, and dark clothes. (*Id.* at 249-55.) Malvizzo confronted the man, saying "Why did you take my son-in-law as a hostage?" and "You want money and jeweleries? Because my son-in-law has no money and no jeweleries." (*Id.* at 256.) The man responded: "Take it easy. Take it easy." (*Id.* at 257.) The man also told Malvizzo not to be nervous. (*Id.*) The house alarm sounded, and the person in the car called out "we have to leave." The man then went back to the car, which drove away. (*Id.* at 258.) At trial, Malvizzo identified the man he spoke with as petitioner Richard Garcia. (*Id.* at 259-61.)

Francesca then received another call from someone asking her to put money in the mailbox, and also a call from a man with a Spanish accent who said that she was stupid and that they were going to hurt her husband. (*Id.* 144-46.) The police were summoned (*id.* at 144) and they arrived at the scene at about 3:00 a.m. (*Id.* at 315-16.) Police found an abandoned Volkswagen car, which still had its lights on, in an a nearby schoolyard (*id.* at 315-19); a motor vehicle check revealed that the car was registered to the DiMartinos' address. (*Id.* at 318.)

After the discovery of the Volkswagen, Officer Francis Conway drove around the neighborhood and noticed a car driving erratically and without its lights on.[1] (*Id.* at 318-324). Conway followed the car and noticed that the two males inside constantly looked back at him. (*Id.* at 322-23.) Conway also ran a check on the license plate, which revealed that the car was registered to a woman with a Brooklyn address. (*Id.* at 324-25.) Once additional police cars arrived, Conway pulled the suspect car over, and

---

[1] The circumstances surrounding the stop and subsequent search of the car are discussed in greater detail *infra* in connection with the suppression hearing.

2

noticed that it was a gold Dodge Intrepid. (*Id.* at 328.) Officer Conway and another officer, Matthew Taormina, spoke with the two occupants of the car; Conway identified the passenger at trial as petitioner Richard Garcia. (*Id.* at 328-33, 339.) After some questioning, the officers found the two individuals' stories to be conflicting. (*Id.* at 334-37.) Conway then opened the trunk of the Dodge Intrepid looking for the potential kidnapping victim. (*Id.* at 353-54, 409-11.) There was no one in the trunk, but Conway did see an NYPD hat, NYPD t-shirt, and a shield holder. (*Id.*) Conway picked up the hat and shirt, which uncovered a semi-automatic handgun on the floor of the trunk and a set of car keys. (*Id.*) The handgun was loaded and its serial number had been partially obliterated or defaced. (*Id.* at 1472-74.) The officers then arrested Garcia and the driver, Rafael Mella-Rodridguez, for possession of the handgun. (*Id.* at 354-56.)

A subsequent search of the Intrepid revealed, *inter alia*, mini-shields in the glove compartment, a pair of black leather or vinyl gloves, a loaded handgun, a blue t-shirt, and a blue hat. (*Id.* at 858, 1107-08.) Police also found mini-shields in the glove compartment of the Dodge Intrepid, which later DNA analysis matched to DiMartino. (*Id.* at 938.) Police later found a Lincoln Town Car parked in an awkward location nearby. (*Id.* at 412-13.) The keys that police had found in the trunk of the Dodge Intrepid matched the Lincoln (*id.* at 414-15), and a search of the Lincoln revealed, *inter alia*, an NYPD t-shirt and NYPD hat. (*Id.* at 860-61.) DNA analysis linked several individuals, including petitioner, to the above-discussed items. Specifically, Garcia's DNA connected him to the blue t-shirt and NYPD hat found in the Dodge Intrepid, as well as a hair and t-shirt found in the Lincoln Town Car. (*Id.* at 864-68, 1128, 1643-44, 1661-63, 1703, 1706.)

In the meantime, DiMartino was held in the van for about six to ten hours (*Id.* at 577-80.) At some point he was taken to Brooklyn, where he eventually escaped. Subsequent investigation by the NYPD in Brooklyn revealed that a van, which was registered to Edward Baez, contained several items connecting it to the kidnapping in Suffolk County, including DiMartino's Costco card and his wife's library card. (*Id.* at 938.)

C. Procedural History

1. Pre-Trial Hearing

The Suffolk County Court held a pre-trial hearing on petitioner's motion to suppress the evidence obtained as a result of Officer Conway's search of the Dodge Intrepid. The following evidence was presented at that hearing.

In the early morning of July 10, 2002, Officer Conway went to the DiMartinos' home at 21 Embassy Road in Selden, NY in response to a report about a possible kidnapping, in which someone was being held at gunpoint. (Hearing at 5-6, 34-36.) At the scene, Conway heard DiMartino's father-in-law, Malvizzo, say that he had seen at least two male suspects flee in a dark colored vehicle. (*Id.* at 6-7, 38-40.) While there, Conway also heard a report that an abandoned Volkswagen had been found with its headlights on in a nearby parking lot. Conway then patrolled the area to look for the kidnappers. (*Id.* at 7-9, 41-42.)

Shortly before 3:30 a.m., on Monarch Avenue in Selden, Conway observed a sedan traveling in excess of the speed limit without its lights on. (*Id.* at 9-12, 43-45.) Conway

3

pulled behind the vehicle at a stop sign, and noticed that the passenger in the vehicle constantly looked back in Conway's direction, while the driver looked back in the rearview mirror. There was so much movement in the car that Conway thought there may have been three occupants. The car hesitated for about 30 seconds at the stop sign and then began to make a turn before activating its turn signal. (*Id.* at 9-13, 43-49.) The car stopped at several stop signs for an inordinate amount of time. At each stop sign, the driver and passenger looked back at Conway.

Meanwhile, Conway had conducted a DMV check on the car, which revealed that the car was registered to a woman in Brooklyn. (*Id.* at 13.) When backup arrived, Conway pulled the car over. (*Id.* at 15, 51, 100.)

Conway spoke to the driver, Mella-Rodriguez, and asked for identification, which was produced. (*Id.* at 15-16, 100-01.) Mella-Rodriguez told Conway that he had been at the Tanger Outlet in Riverhead and had gotten lost. Conway stated that it was 3:30 in the morning, that the outlet stores had closed, and that they were far from Riverhead. (*Id.* at 15-19.) Conway asked Mella-Rodriguez where they were going, to which Mella-Rodriguez replied "home." Conway pointed out they could not "really get to Brooklyn from here." (*Id.* at 19.) At that point, Mella-Rodriguez refused to speak in English, saying that he did not understand what Conway was saying. (*Id.*)

Mella-Rodriguez and the passenger, Garcia, attempted to speak to one another in Spanish, but the officers ordered Garcia to step out of the car and separated the two men. (*Id.* at 17, 105.) Another police officer, Matthew Taormina spoke with Garcia. (*Id.* at 104-05.) Garcia stated that the two had been clothing shopping, but Taormina noticed that there were only candles in the backseat of the car. (*Id.* at 106.) At some point, Garcia refused to speak in English. (*Id.* at 107.) Garcia told a Spanish-speaking police officer that a third person had been in the car, but Mella-Rodriguez denied this. (*Id.* at 107-08.)

At this point, Officer Conway opened the trunk of the Dodge Intrepid (*id.* at 26-27) and saw an NYPD hat and NYPD t-shirt on the floor. (*Id.* at 27.) Sticking out from underneath the shirt was what appeared to be the type of chain used by police officers for their shields. (*Id.*) Conway picked up the hat and the shirt to see if there was a police ID or shield underneath, and found a shield and handgun. (*Id.* at 27-28.) The officers also found a set of keys. (*Id.* at 109-10.)

By written decision dated April 1, 2003, the Supreme Court denied petitioner's motion to suppress, ruling that the stop and search of the Dodge Intrepid were lawful.

2. Trial and Direct Appeal

Petitioner was tried with co-defendants Joel Rojas and Edward Baez.[2] On September 4, 2003, following a jury trial, petitioner Richard Garcia was convicted of one count of kidnapping in the first degree,[3] N.Y. Penal Law § 135.25, two counts of criminal possession of a weapon in the third degree, N.Y. Penal Law § 265.02, and one count of

---

[2] Baez was tried by a separate jury at the same trial as Garcia and Rojas. Co-defendant Rafael Mella-Rodriguez was tried separately due to illness.

[3] Petitioner was also convicted of kidnapping in the second degree, but the trial court dismissed this charge as a lesser-included offense.

criminal impersonation in the first degree, N.Y. Penal Law § 190.26. Petitioner was sentenced to concurrent terms of imprisonment of sixteen years to life for the kidnapping conviction, two to six years for each of the weapon possession convictions, and one to three years for the impersonation conviction.

Petitioner appealed his convictions to the New York Supreme Court, Appellate Division, Second Department. Petitioner raised the following grounds: (1) the trial court erred in failing to suppress evidence recovered as a result of the search of the Dodge Intrepid's trunk; (2) the trial court erred in failing to sever petitioner's trial from that of his co-defendants; (3) the People failed to prove petitioner's guilt beyond a reasonable doubt; and (4) the sentence imposed was harsh and excessive. The Appellate Division affirmed the conviction. *People v. Garcia*, 834 N.Y.S.2d 259 (App. Div. 2007). The Court of Appeals denied petitioner leave to appeal. *People v. Garcia*, 872 N.E.2d 883 (N.Y. 2007).

### 3. The Instant Petition

Petitioner filed the instant petition on March 31, 2008. Respondent filed its opposition on May 23, 2008. This matter is fully submitted.

### II. STANDARD OF REVIEW

To determine whether petitioner is entitled to a writ of habeas corpus, a federal court must apply the standard of review set forth in 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which provides, in relevant part:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2554. "Clearly established Federal law" is comprised of "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Green v. Travis*, 414 F.3d 288, 296 (2d Cir. 2005) (quoting *Williams v. Taylor*, 529 U.S. 362, 412 (2000)).

A decision is "contrary to" clearly established federal law, as determined by the Supreme Court, "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams*, 529 U.S. at 413. A decision is an "unreasonable application" of clearly established federal law if a state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's

5

case." *Id.*

AEDPA establishes a deferential standard of review: "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Gilchrist v. O'Keefe*, 260 F.3d 87, 93 (2d Cir. 2001) (quoting *Williams*, 529 U.S. at 411). The Second Circuit added that, while "[s]ome increment of incorrectness beyond error is required . . . the increment need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." *Id.* (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). Finally, "if the federal claim was not adjudicated on the merits, 'AEDPA deference is not required, and conclusions of law and mixed findings of fact and conclusions of law are reviewed *de novo*.'" *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009) (quoting *Spears v. Greiner*, 459 F.3d 200, 203 (2d Cir. 2006)).

### III. DISCUSSION

#### A. Bar to Fourth Amendment Claim

As a threshold matter, it is well-settled that "[w]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976). The Second Circuit has further explained that, under *Powell*, "review of fourth amendment claims in habeas petitions would be undertaken in only one of two instances: (a) if the state has provided no corrective procedures at all to redress the alleged fourth amendment violations; or (b) if the state has provided a corrective mechanism, but the defendant was precluded from using that mechanism because of an unconscionable breakdown in the underlying process." *Capellan v. Riley*, 975 F.2d 67, 70 (2d Cir. 1992) (citing *Gates v. Henderson*, 568 F.2d 830, 839 (2d Cir. 1977) (en banc)). Courts have viewed such a breakdown to occur when the state court "failed to conduct a reasoned method of inquiry into the relevant questions of fact and law." *Capellan*, 975 F.2d at 71 (citations and quotations omitted).

With respect to the existence of corrective procedures, it is clear that New York has adequate corrective procedures, which are set forth in New York Criminal Procedure Law § 710.10, *et seq.*, for litigating Fourth Amendment claims. *See, e.g.*, *Capellan,* 975 F.2d at 70 n.1 ("[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims . . . as being facially adequate.'" (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989))). Moreover, in the instant case, there is absolutely no evidence of an unconscionable breakdown in the underlying process. To the contrary, after the petitioner filed his motion to suppress, the court conducted a pre-trial evidentiary hearing. After the hearing, the court issued a written decision finding that the stop and search of the Dodge Intrepid were lawful. Petitioner also raised his Fourth Amendment claim on appeal to the Appellate Division, which affirmed the lower court ruling. Thus, the record reveals no "'disruption or obstruction of a state proceeding' typifying an unconscionable breakdown," *Capellan*, 975 F.2d at 70 (quoting *Shaw v. Scully*, 654 F. Supp. 859,

864 (S.D.N.Y. 1987)); rather, the record clearly establishes that the state court conducted a reasoned and thorough method of inquiry into the relevant facts. In short, having fully availed himself of New York's corrective procedures regarding his Fourth Amendment claim, petitioner has had an opportunity for full and fair litigation of the claim and may not raise it on federal habeas review. *See, e.g.*, *Garret v. Smith*, No. 05-CV-3374(JFB), 2006 WL 2265094, at *8 (E.D.N.Y. Aug. 8, 2006).

B. Review on the Merits

1. Fourth Amendment Claim

As set forth above, the Court cannot grant relief on petitioner's Fourth Amendment claim because petitioner had a full and fair opportunity to litigate the claim in state court. In any event, even if the Court could review the underlying merits of this claim, the claim fails for the reasons set forth below.

The Appellate Division rejected petitioner's Fourth Amendment claim on the merits; therefore, AEDPA deference applies. The state court held, first, that the police lawfully stopped the vehicle. *Garcia*, 834 N.Y.S.2d at 260. The court next concluded that the decision to open the trunk of the car "to see if the missing kidnap victim was inside was justified under the emergency exception doctrine." *Id.* Finally, the Appellate Division rejected petitioner's claim that once it became apparent that no person was inside the trunk, the police lacked probable cause to move the NYPD t-shirt, which was covering a handgun.[4] Specifically, the court held that

"the defendant, who was a passenger in the car, lacked standing to contest the search of the lawfully-stopped vehicle." *Id.* For the reasons set forth below, the Court concludes that the state court's ruling was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record.

Petitioner argues that the police lacked probable cause to open the trunk of the Dodge Intrepid and, furthermore, that even if they could open the trunk, they did not have probable cause to move the NYPD t-shirt and hat on the floor of the trunk. Therefore, petitioner argues that the handgun and other items found underneath the shirt should have been suppressed.[5] However, the Court need

___

Court could review a Fourth Amendment claim generally, it could not review this particular claim because petitioner has not demonstrated cause for the default, prejudice resulting therefrom, or a miscarriage of justice. *See Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).

[5] Petitioner does not appear to challenge the lawfulness of the initial stop of the Dodge Intrepid. In any event, the Court rejects any claim by petitioner that the stop was unlawful. The Court recognizes that a car passenger may challenge the initial stop or seizure of the car. *See Brendlin v. California*, 551 U.S. 249, 251 (2007). However, "[t]he reasonableness of an officer's discretionary decision to stop an automobile . . . turns on whether there is probable cause to believe that a traffic violation has occurred." *City of Indianapolis v. Edmond*, 531 U.S. 32, 51 (2000) (citing *Whren v. United States*, 517 U.S. 806 (1996)). In this case, Officer Conway had, at the very least, probable cause to stop the Dodge Intrepid for the observed traffic violations. Therefore, the Court concludes that the Appellate Division's ruling that the stop was legal was not contrary to, or an unreasonable application of,

___

[4] The Appellate Division also held that this argument was unpreserved for review. *Garcia*, 834 N.Y.S.2d at 260. Therefore, even if this

7

not address whether the police had probable cause to search the trunk of the Dodge Intrepid or to move the items found therein because, as discussed below, petitioner did not have a reasonable expectation of privacy in the area searched.

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. As the Supreme Court has held, "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133-34 (1978). Thus,

> [a] person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed. And since the exclusionary rule is an attempt to effectuate the guarantees of the Fourth Amendment, it is proper to permit only defendants whose Fourth Amendment rights have been violated to benefit from the rule's protections.

*Id.* (citations omitted). The threshold question in determining whether a person's Fourth Amendment rights have been violated is "whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Id.* at 143 (citing *Katz v. United States*, 389 U.S. 347, 353 (1967)). Thus, in order to demonstrate a reasonable expectation of privacy, "[f]irst, the person challenging the search must demonstrate a subjective desire to keep his or her effects private; and, second, the individual's subjective expectation must be one that society accepts as reasonable." *United States v. Paulino*, 850 F.2d 93, 96-97 (2d Cir. 1988). The defendant seeking suppression bears the burden on this issue. *See United States v. Pena*, 961 F.2d 333, 336 (2d Cir. 1992).

In this case, petitioner was merely a passenger in the Dodge Intrepid. (Hearing at 13, 91.) Although petitioner may have had a subjective expectation of privacy in the trunk of the car, *see, e.g.*, *Paulino*, 850 F.2d at 97 (holding that hiding counterfeit bills under rubber mat was sufficient to show subjective expectation of privacy), petitioner has made no showing that that expectation was reasonable.[6] Indeed, nothing in the record indicates that petitioner had any interest in the car apart from his status as a passenger. It is well established that a passenger in a car lacks a reasonable expectation of privacy in the vehicle merely by virtue of his status as a passenger.[7] *See Rakas*, 439 U.S. at 148-49

---

clearly established federal law, nor was it an unreasonable determination of the facts in light of the entire record.

[6] Although respondent argues that petitioner lacks Fourth Amendment "standing," "the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." *Rakas*, 439 U.S. at 139. In any event, "[t]he outcome is likely to be the same under either theory, but this approach promotes analytical clarity." *Pena*, 961 F.2d at 336.

[7] Although not raised by petitioner, the Court notes that, under New York law, a passenger defendant can challenge a search when he is thereafter charged with possessing an item found in the vehicle based on a statutory presumption. *See People v. Wesley*, 73 N.Y.2d 351, 360-64 (1989). However, petitioner was not charged with possession based on a statutory presumption, and the trial court did not give such an instruction.

8

(rejecting Fourth Amendment claim by passengers of automobile "since they made no showing that they had any legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers. Like the trunk of an automobile, these are areas in which a passenger *qua* passenger simply would not normally have a legitimate expectation of privacy"); *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993) (holding that passenger in a taxi cab did not have reasonable expectation of privacy in the car's trunk); *Paulino*, 850 F.2d at 97 (holding that car passenger had no reasonable expectation of privacy in the area under the floor mat because, *inter alia*, "[a]s a passenger [defendant] had no right to exclude others from the vehicle"); *see also, e.g.*, *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005) ("As a passenger with no possessory interest in the car . . ., [defendant] has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car." (quotation omitted)); *United States v. Hall*, 419 F. Supp. 2d 279, 283 (E.D.N.Y. 2005) ("Because he was merely [a] passenger in [the] vehicle, [defendant] has not established that any expectation of privacy that he may have had was reasonable."). Thus, petitioner has made no showing that he had a reasonable expectation of privacy in the Dodge Intrepid.

For the reasons set forth above, the Court concludes that the Appellate Division's ruling was not contrary to, or an unreasonable application of, clearly established federal law, nor was it an unreasonable determination of

---

(*See* Tr. 2045-50.) Thus, petitioner has no claim based on the search of the car. *See, e.g.*, *People v. Reynolds*, 629 N.Y.S.2d 355, 356 (App. Div. 1995).

the facts in light of the record. In short, petitioner's Fourth Amendment claim is without merit.[8]

### 2. Severance Claim

Petitioner also claims that the trial court's denial of his motion for severance deprived him of a fair trial. For the reasons set forth below, the Court rejects this claim on the merits.

### 1. Legal Standard

As a threshold matter, joinder of defendants is a question of state law and, therefore, does not ordinarily present a question for habeas review. *See, e.g.*, *Shodunke v. County of Queens*, No. 07-CV-329(RJD), 2009 WL 5172895, at *2 (E.D.N.Y. Dec. 30, 2009); *Pineda v. Miller*, No. 03 CV 1344(NG)(MDG), 2006 WL 2239105, at *15 (E.D.N.Y. Aug. 4, 2006). The Second Circuit has held that in order to "set aside a state court conviction because of the denial of a severance motion, a federal court must conclude that the petitioner's right to a fair trial, as secured under the Fourteenth Amendment, was abridged." *Grant v. Hoke*, 921 F.2d 28, 31 (2d Cir. 1990); *Funches v. Walsh*, No. 05 Civ. 2839(NRB), 2006 WL 1063287, at *8 (S.D.N.Y. Apr. 21, 2006) ("To grant federal habeas corpus relief on the basis of an improper denial of severance, a federal court must find that the joinder was so

---

[8] Because the Court concludes that petitioner did not have a reasonable expectation of privacy in the trunk of the car, and, therefore, there was no Fourth Amendment violation, the Court does not consider the separate question of whether police had probable cause to open the trunk or to move the items seen in the trunk.

prejudicial as to deny the petitioner a fair trial." (citing *Grant*, 921 F.2d at 31)).[9] Although the Second Circuit has not articulated what standard to apply to a habeas claim based on denial of a severance motion, a petitioner's burden "is 'at least' as great as that of a federal defendant raising the same claim on direct appeal." *Russ v. Greene*, No. 04-CV-6079(VEB), 2009 U.S. Dist. LEXIS 82954, at *17 (W.D.N.Y. Sept. 11, 2009) (collecting cases).

Under both federal and state law, there is a preference for joint trials of defendants who are indicted together. *See Zafiro v. United States*, 506 U.S. 534, 537 (1993) ("There is a preference in the federal system for joint trials of defendants who are indicted together. Joint trials play a vital role in the criminal justice system. They promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."); *People v. Cardwell*, 580 N.E.2d 753, 753 (N.Y. 1991) ("In all cases a strong public policy favors joinder, because it expedites the judicial process, reduces court congestion, and avoids the necessity of recalling witnesses." (quotation omitted)). Furthermore, "[a]s a general rule in federal court, the decision whether to grant a severance is 'committed to the sound discretion of the trial judge.'"

---

[9] The Court recognizes that *Grant v. Hoke* was decided pre-AEDPA and that, apparently, "[n]o Supreme Court opinion has ever addressed when severance is constitutionally mandated or how a federal habeas court should review a state court's denial of a severance motion." *Castro v. Fisher*, No. 04 Civ. 346 (DLC), 2004 WL 2525876, at *5 (S.D.N.Y. Nov. 8, 2004). In any event, for the reasons discussed *infra*, petitioner is unable to show that the denial of his severance motion resulted in a fundamentally unfair trial under federal law.

*Grant*, 921 F.2d at 31.

"[I]t is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Zafiro*, 506 U.S. at 540; *Grant*, 921 F.2d at 31 ("A defendant seeking to overturn a denial of a severance motion . . . must show that he was so severely prejudiced by the joinder as to have been denied a fair trial, not that he might have had a better chance for acquittal at a separate trial." (quotation omitted)); *see also, e.g.*, *Smith v. Mann*, No. 98-2740, 2000 WL 298256, at *1 (2d Cir. Mar. 21, 2000). For this reason, "[i]ncidental prejudice, which is almost always present when multiple defendants who played different roles are tried together, will not be enough." *Mercedes v. Herbert*, No. 01 Civ. 1359(DC), 2002 WL 826809, at *5 (S.D.N.Y. Apr. 30, 2002) (citing *United States v. Martinez*, 922 F.2d 914, 922 (1st Cir. 1991)).

The Second Circuit has held that a joint trial may be fundamentally unfair where co-defendants have mutually antagonistic defenses. However, under federal law, "[m]utually antagonistic defenses are not prejudicial *per se*." *Zafiro*, 506 U.S. at 538; *see also United States v. Casamento*, 887 F.2d 1141, 1154 (2d Cir. 1989) (holding that "[m]ere fingerpointing does not require severance"), *cert. denied*, 493 U.S. 1081 (1990). The Second Circuit has explained:

> a joint trial is fundamentally unfair where codefendants present mutually antagonistic defenses. However, a simple showing of some antagonism between defendants' theories of defense does not require severance. Rather, separate trials are required only upon a showing that the jury, in order to believe the core of testimony offered on

10

behalf of one defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant.

*Grant*, 921 F.2d at 31 (internal quotations, citations, and alterations omitted).

## 2. Application

Petitioner argues that, at trial, he planned to present a defense that he had been present for the commission of the crimes, but that he did not participate in them. However, petitioner argues that he was required to change that defense to one of misidentification so as not to conflict with the defense of his co-defendants. In denying petitioner's motion for severance, the trial court relied on *People v. Allaway*, 568 N.Y.S.2d 154, 155-56 (App. Div. 1991) ("In this case, the defenses were not in irreconcilable conflict with each other so as to compel a severance. It was the defendant's claim that he was not at the scene of the crime. The codefendants contended that while they were present at the scene of the crime, they were merely bystanders who did not take part in the attack."). The Appellate Division also found that petitioner's severance claim was without merit. *Garcia*, 834 N.Y.S.2d at 260. Therefore, AEDPA deference applies. Because the ruling was not contrary to, or an unreasonable application of, clearly established federal law, the Court rejects petitioner's severance claim.

Under New York law, two or more defendants may be jointly charged and tried when the offenses charged are "based upon the same criminal transaction . . . ." N.Y. Crim. Proc. Law § 200.40. Petitioner and his co-defendants were charged with participating in the same kidnapping scheme, and, therefore, there is no showing that joinder was improper.

Although petitioner argues that he was denied a fair trial because he and his co-defendants had potentially mutually antagonistic defenses, the Court rejects that argument. First, the mere fact that one defendant asserts an innocent bystander defense whereas one asserts some other defense does not require severance under federal law. *See United States v. Cardascia*, 951 F.2d 474, 485 (2d Cir. 1991) ("The defenses Cardascia and Rizzo offered, though antagonistic and at points inconsistent, were not mutually exclusive at their core or essence. Cardascia claims he was duped by the codefendants . . . . Rizzo claims that he was not a part of the conspiracy, but rather an innocent and unknowing bystander . . . . But appellants failed to establish that due to the conflicting defenses, the jury could not have determined that the other defendants . . . defrauded Cardascia and the bank, and implicated Rizzo without his knowing it."); *Aimone v. Scully*, 849 F.2d 87, 88 (2d Cir. 1988) ("The trial court acted within its discretion in denying appellant's motion for severance in light of the fact that the underlying drug law offense was committed by both appellant and the co-defendant, John Ross, and the two men were charged in a single indictment. Ross' defense was not antagonistic to [defendant's], which was that he was an innocent bystander, rather than a supplier, in a drug deal that Ross made with an undercover agent."); *see also, e.g.*, *Funches v. Walsh*, No. 05 Civ. 2839(NRB), 2006 WL 1063287, at *9 (S.D.N.Y. Apr. 21, 2006) ("[W]e are unpersuaded that the defenses presented in this case rose to the level of mutually irreconcilable antagonism. Both defendants denied participation in any crime and neither admitted to knowing or interacting with the other. Thus, petitioner's

botched drug deal defense could have been believed without precluding the acquittal of his codefendant. Likewise, the jury could have accepted [the codefendant's] misidentification defense and still acquitted petitioner.").

Furthermore, in this case, petitioner does not argue that he and his co-defendants did, in fact, present mutually antagonistic defenses at trial. Thus, he has failed to show that conflicting defenses resulted in unfair prejudice. *See, e.g.*, *Mercedes v. Herbert*, No. 01 Civ. 1359(DC), 2002 WL 826809, at *5 (S.D.N.Y. Apr. 30, 2002) ("[T]he record does not reveal an irreconcilable conflict between the petitioner's defense and that of his eight co-defendants such that the conflict alone would have led the jury to infer the petitioner's guilt." (emphasis added)). Instead, petitioner argues that if his trial had been severed: he would have argued that although he was present for the crimes, he did not participate in them; he would have implicated his co-defendants and established their roles in the crimes; and his co-defendants would have done the same to him. (Pet. at 27-29.) However, in order to succeed on an "irreconcilable defense" argument, petitioner must "make a factual demonstration that acceptance of one party's defense would tend to preclude acquittal of the other." *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1988) (quotation and alterations omitted). Mere speculation as to what defenses might be offered is insufficient. *See, e.g.*, *United States v. Galinson*, No. 09 Cr. 523(LTS), 2008 WL 577297, at *1 (S.D.N.Y. Feb. 22, 2008) ("[Defendant] does not identify the specific aspects of the conspiracy charges that he expects will be disputed by the co-defendants, nor does he articulate the extent to which his defense is dependent on such disputed facts. Rather, [defendant's] primary basis for seeking severance is the mere possibility that one co-defendant's defense will contradict portions of another co-defendant's defense. This level of prejudice is too speculative and minimal to justify severance . . . ."); *United States v. Jacques Dessange, Inc.*, No. 99 CR 1182(DLC), 2000 WL 280050, at *7 (S.D.N.Y. Mar. 14, 2000) ("[I]t is not clear what defense [defendant] intends to proffer at trial, much less that such proffered defense will necessarily be antagonistic to that of his co-defendant, such that the jury would have to choose between them. [Defendant] has not offered any affidavit setting forth his defense and has not provided any affidavit or evidence reflecting the defense to be proffered at trial by [his co-defendant]."); *United States v. Yousef*, S12 93 Cr. 180(KTD), 1997 U.S. Dist. LEXIS 10449, at *5-6 (S.D.N.Y. July 16, 1997) ("[Defendant] argues, in sum, that [his co-defendant] might attempt to blame him for the alleged crimes. Such speculation, however, does not rise to the level of 'mutually antagonistic' defenses. Even if [defendant's] speculation proves true, the fact that one defendant seeks to place blame on the other is not a sufficient basis for severance." (citing *Casamento*, 887 F.2d at 1154)). Because petitioner does not explain in anything but a conclusory manner how his defense *might have* conflicted with that of his co-defendants, any prejudice caused by the denial of his severance motion is too speculative for this Court to conclude that petitioner's trial was fundamentally unfair. *See Zafiro*, 506 U.S. at 540 ("[D]efendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials.").

Finally, the Court concludes that any potential prejudice resulting from a joint trial was cured by the trial court's jury instructions. The trial judge emphasized that

12

"there are two defendants on trial here. Each must be considered separately. The evidence as to each must be evaluated separately. Each, in effect, has to stand on its own. Each case. Guilty or not guilty." (Tr. 2031, 2056-57.) The jury is presumed to have followed that instruction. *See Zafiro*, 506 U.S. at 540-41; *see also, e.g.*, *Castro v. Fisher*, No. 04 Civ. 0346(DLJ)(AJP), 2004 U.S. Dist. LEXIS 13976, at *69 (S.D.N.Y. July 23, 2004) ("[T]he trial judge alleviated any potential prejudice [from conflicting defenses] with proper curative instructions immediately following summation on the prosecution's burden of proving every element of every crime as to each defendant beyond a reasonable doubt." (citing *Zafiro*, 506 U.S. at 541 and *United States v. Harmond*, 998 F.2d 91, 95 (2d Cir. 1993))), *adopted by* 2004 U.S. Dist. LEXIS 22527 (S.D.N.Y. Nov. 8, 2004).

In short, the state court's denial of petitioner's severance motion was not contrary to, or an unreasonable application of, clearly established federal law.[10] Therefore, the Court rejects petitioner's severance claim on the merits.

### 3. Insufficient Evidence Claim

Petitioner claims that the evidence presented at trial was legally insufficient to convict him of the charged crimes. For the reasons set forth below, the Court rejects that claim on the merits.

### 1. Legal Standard

A petitioner "bears a very heavy burden" when challenging the legal sufficiency of the evidence in an application for a writ of habeas corpus. *Eingaugler v. Supreme Court of the State of N.Y.*, 109 F.3d 836, 840 (2d Cir. 1997). A criminal conviction in state court will not be reversed if, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1976); *see also Policano v. Herbert*, 507 F.3d 111, 115-16 (2d Cir. 2007) (stating that "[i]n a challenge to a state criminal conviction brought under 28 U.S.C. § 2254 . . . the applicant is entitled to habeas corpus relief if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt" (quoting *Jackson*, 443 U.S. at 324)); *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) ("[W]e review the evidence in the light most favorable to the State and the applicant is entitled to habeas corpus relief only if no rational trier of fact could find proof of guilt beyond a reasonable doubt based on the evidence adduced at trial."). A criminal conviction will stand so long as "a reasonable mind 'might fairly conclude guilt beyond a reasonable doubt.'" *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir. 1993) (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984) (internal quotation omitted)). Even when "faced with a record of historical facts that supports conflicting inferences [a court] must presume – even if it does not affirmatively appear in the record – that the

---

[10] The Court notes that the trial court presided over pre-trial hearings in this case and was in a better position than this Court to consider any potential prejudice to petitioner. The Court also notes that the trial court ordered a separate jury for co-defendant Baez because of incriminating statements he had made to the police and which could have created potential problems under *Bruton v. United States*, 391 U.S. 123 (1968), which further indicates that the trial court properly and carefully exercised its discretion.

trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir. 1994) (quoting *Jackson*, 443 U.S. at 326).

### 2. Application

In the instant case, petitioner argues that his convictions were not based on legally sufficient evidence. The Appellate Division rejected this claim on the merits, holding that, viewing the evidence in the light most favorable to the prosecution, the evidence "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." *Garcia*, 834 N.Y.S.2d at 259. Therefore, AEDPA deference applies. For the reasons set forth below, the Court concludes that the Appellate Division's ruling was not contrary to, or an unreasonable application of, clearly established federal law.

Petitioner was convicted of kidnapping in the first degree, two counts of criminal possession of a weapon in the third degree,[11] and criminal impersonation in the first degree. Under New York Penal Law § 135.25[1], "[a] person is guilty of kidnapping in the first degree when he abducts another person and when . . . [h]is intent is to compel a third person to pay or deliver money or property as ransom . . . ." Under New York Penal Law § 265.02 at the time,[12] "[a] person is guilty of criminal possession of a weapon in the third degree when . . . [s]uch person knowingly possesses a . . . firearm . . . which has been defaced for the purpose of concealment or prevention of the detection of a crime or misrepresenting the identity of such . . . firearm . . . or . . . [s]uch person possesses any loaded firearm . . . except . . . in such person's home or place of business." Under New York Penal Law § 190.26, "[a] person is guilty of criminal impersonation in the first degree when he . . . [p]retends to be a police officer . . . and . . . [s]o acts with intent to induce another to submit to such pretended official authority or otherwise to act in reliance upon said pretense and in the course of such pretense commits or attempts to commit a felony."

The evidence against petitioner on all of the charged crimes was overwhelming. For instance, petitioner was identified by an eyewitness as approaching the victim's home at about 2:50 a.m., shortly before and after threatening calls demanding ransom were made to the house. (Tr. 249-61.) Shortly thereafter, police stopped a Dodge Intrepid, in which petitioner was a passenger, near the victim's home; the car was driving in excess of the speed limit and without its lights on. (*Id.* at 318-24, 328-33, 339.) Petitioner's DNA was found on an NYPD hat and shirt in the Dodge Intrepid, as well as on a hair and shirt found in the nearby parked Lincoln Town Car. (*Id.* at 864-68, 1128, 1643-44, 1661-63, 1703, 1706.) A loaded handgun, which had its serial number at least partially defaced, was found in the trunk of the Dodge

---

[11] Petitioner was convicted of two counts of criminal possession of a weapon in the third degree — one count on the theory that petitioner had possessed a gun that had been defaced for purposes of concealment; one count on the theory that petitioner had possessed a loaded gun not in the home or place of business. (*See* Tr. 2045-50; 2086-87.) The parties in this case do not distinguish between the two counts. In any event, the Court concludes, in light of the entire record, that the evidence was sufficient for the jury to conclude that petitioner was guilty of both counts.

[12] The statute was amended in 2006.

14

Intrepid. (*Id.* at 1472-74.) In short, as the Appellate Division held:

> The circumstances of the defendant's arrest in terms of the temporal and geographical proximity to the scene of the crime, his possession of various instrumentalities of the crime, and the forensic evidence, coupled with the identification by the victim's father-in-law of the defendant as the man who came to the house to collect the ransom, firmly established his role in the crimes.

*Id.* The Court agrees with that analysis.

Petitioner argues primarily that the evidence was insufficient to support a conviction without the evidence found in the Dodge Intrepid, which, petitioner argues, should have been suppressed. (Pet. at 30-31.) The Court rejects this argument. As a threshold matter, the suppression argument is without merit for the reasons discussed *supra*. In any event, it is well settled that, in considering a sufficiency of the evidence claim on habeas review, a federal court must consider all of the evidence before the jury "regardless whether that evidence was admitted erroneously." *See McDaniel v. Brown*, 130 S. Ct. 665, 672 (2010) (citing *Lockhart v. Nelson*, 488 U.S. 33, 41 (1988)). Therefore, the Court considers all of the evidence presented to the jury.

To the extent petitioner challenges the jury's verdict based on alternative explanations for the DNA evidence or the alleged unreliability of Domenico Malvizzo's eyewitness identification (Pet. at 31), the Court rejects those arguments. *See Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001) ("'[T]he reliability of properly admitted eyewitness identification, like the credibility of the other parts of the prosecution's case is a matter for the jury.'" (quoting *Foster v. California*, 394 U.S. 440, 442 n.2 (1969))). It is well established that any alleged inconsistencies "were for the jury to decide." *See Quartaro*, 186 F.3d at 96. Under these circumstances, there is no basis to disturb the jury's finding. *See, e.g.*, *United States v. Valenzuela*, 722 F.2d 1431, 1433 (9th Cir. 1983) ("With respect to identification evidence, the Due Process Clause protects solely an evidentiary interest . . . , an interest normally vindicated through the adversarial process of cross-examination. . . . The jury herein was advised of [the eyewitness's] inability to select defendant from the photo spread and her failure to mention defendant's wrinkled face and balding condition when she described the bandit after the robbery. The admission of the in-court identification was not error." (internal quotation omitted)); *see also Gruttola v. Hammock*, 639 F.2d 922, 928 (2d Cir. 1981) ("[T]he jury's decision was largely a matter of choosing whether to believe [the defense's] version of the events or to believe the version offered by the State. The jury chose to believe the State's witnesses. . . . We cannot say that no rational jury could have found guilt beyond a reasonable doubt on all the evidence."); *Williams v. Bennet*, No. 97 CIV. 1628 (HB), 1998 WL 236222, at *5 (S.D.N.Y. Apr. 20, 1998) ("[Petitioner] relies on inconsistencies in his victim's trial testimony as compared to her statements to the police, the District Attorney's office and before the grand jury. These inconsistencies were placed before the jury by the defense, which made them a central focus of its case. The jury's decision to credit [the victim's] testimony, despite its inconsistencies, over [petitioner's] testimony, is fully supported by the record."); *accord Simpson v. Portuondo*, No. 01 CIV 1379 (BSJ)(AJP), 2001 WL 830946, at *8

(S.D.N.Y. July 12, 2001) (Report and Recommendation) (collecting cases).

In sum, the Court concludes that the Appellate Division's ruling was not contrary to, or an unreasonable application of, clearly established federal law. Therefore, the Court rejects petitioner's insufficiency of the evidence claim on the merits.

4. Harsh and Excessive Sentence Claim

As a threshold matter, to the extent that petitioner relies on state law as a grounds for an excessive sentence claim, such a claim is not cognizable on habeas review.[13] *See, e.g.*, *Wilson v. Ercole*, No. 06-cv-553 (DLI), 2009 U.S. Dist. LEXIS 23447, at *30-31 (E.D.N.Y. Mar. 23, 2009) ("On his direct appeal, petitioner . . . did not contend that this sentence violated his constitutional rights, but instead urged the Appellate Division to reduce the sentence under C.P.L. § 470.15(6)(b), which gives the state court broad plenary power to modify a sentence that is unduly harsh or severe, though legal. The Appellate Division declined, stating that the 'sentence imposed was not excessive.' Petitioner now re-asserts this identical claim. Given that this claim rests exclusively on state law, the court may not review it under 28 U.S.C. § 2254(d)." (internal citations omitted)).

To the extent petitioner raises a federal claim that his sentence was cruel and unusual punishment under the Eighth Amendment, the Court rejects such an argument. For the purpose of habeas review, "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992); *see also Santiago v. Riley*, 92-cv-2302 (DRH), 1993 U.S. Dist. LEXIS 6990, at *11-12 (E.D.N.Y. May 14, 1993) ("Where the sentence imposed by a state trial judge is within the statutorily prescribed range, the constitution is not implicated and there is no federal question for habeas corpus review." (citation omitted)); *Underwood v. Kelly*, 692 F. Supp. 146, 152 (E.D.N.Y. 1988), *aff'd*, 875 F.2d 857 (2d Cir. 1989).

In this case, petitioner was sentenced to concurrent terms of imprisonment of sixteen years to life on the kidnapping charge, two to six years on each of the weapon possession charges, and one to three years on the criminal impersonation charge. (Sentencing at 12-13.) Such a sentence is within the range prescribed for those crimes by New York law. *See* N.Y. Penal Law § 70.00. As petitioner's sentence is within the statutorily prescribed range, it raises no constitutional concerns and, therefore, petitioner's sentence claim is without merit.[14]

\*\*\*

In sum, having carefully examined the merits of all of petitioner's claims, the Court concludes that petitioner has failed to demonstrate that any state court ruling was contrary to, or was an unreasonable application of, clearly established federal law, or that any state court decision was an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. In short, the Court

---

[13] The Appellate Division rejected petitioner's harsh and excessive sentence claim on the merits. *See Garcia*, 834 N.Y.S.2d at 260.

[14] In any event, there would be no basis to find the sentence unconstitutionally excessive when considered in light of the severity of the crimes for which petitioner was convicted in this case.

16

concludes that all of petitioner's claims lack merit.

### IV. CONCLUSION

For the foregoing reasons, petitioner has demonstrated no basis for relief under 28 U.S.C. § 2254. Therefore, the petition for a writ of habeas corpus is denied. Because petitioner has failed to make a substantial showing of a denial of a constitutional right, no certificate of appealability shall issue. *See* 28 U.S.C. § 2253(c)(2). The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: May 5, 2010
Central Islip, New York

Petitioner is proceeding *pro se*. Attorney for respondent is Thomas J. Spota, Suffolk County District Attorney, by Steven A. Hovani and Marcia R. Kucera, Assistant District Attorneys, 200 Center Drive, Riverhead, NY 11901.